Cooke, J.
(concurring). I concur in the underlying reasoning and result arrived at in the majority opinion but do not find it necessary to subscribe to all of the implications which may affect this or other cases when the merits may be reached by motion or trial.
Fuchsberg, J.
(concurring). Though I wholeheartedly join in the disposition of this case and of the questions necessary to its determination, I find aspects of the majority opinion sufficiently disturbing to compel me to comment.
*455 For one, the court’s indorsement of cases which are said to have held that mere (p 452) "concealment by a physician or failure to diclose his own malpractice” does not toll the Statute of Limitations is both peripheral and unnecessary to today’s decision. Moreover, it suffers from more than the ordinary weakness of dictum. It gratuitously renews the blessing, given at an earlier time and in a different clime, to a proposition whose soundness has, in the intervening years, been the object of widespread and increasing criticism, much of which characterizes willful nondisclosure as "constructive fraud” (Morrison v Acton, 68 Ariz 27; Prosser, Torts [4th ed], § 30, pp 144-145; Sacks, Statutes of Limitations and Undiscovered Malpractice, 16 Clev Marsh L Rev 65, 72; 2 Louisell and Williams, Medical Malpractice, pars 13.06-13.09; 32 ATLA LJ 260-265; cf. Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427, disapproving Conklin v Draper, 229 App Div 227, affd 254 NY 620).
Most especially in this situation — where, as we all recognize, a balance must be struck between according a reasonable measure of justice to patients and giving adequate protection to physicians subjected to delayed suits — appraisal or reappraisal should await direct confrontation in a case on point. In such circumstances, simple logic and long experience teach that, absent immediacy of a need to decide, the rush to present judgment, however well-intentioned, impermissibly enhances the ever-present risk that, by the time the question does arise directly, further study and later events will have turned the premature pronouncement of yesterday into a jurisprudential obstacle of tomorrow (Cooke v New Riv. Co., 38 Ch Div 56, 70-71 [1888] [Bowen, L. J.]; cf. Smith v Hedges, 223 NY 176, 184 [Cardozo, J., dissenting]).
I also refuse to join in what I regard as the equally unnecessary and, so far as the record reveals, unfounded factual and qualitative assumptions implicit in phrases such as opening the (p 454) "floodgates” (p 453) "ballooning malpractice recoveries” and "legitimate concern both from the standpoint of the profession and the public as to the economic import” of malpractice recoveries. Such expressions, which omit the concerns of those injured by medical negligence, are, I respectfully suggest, best avoided. All the more is that so in a situation where, as has been widely reported and openly admitted, large sums have been expended by interested parties to influence public opinion (see Aitken, Medical Malprac *456 tice: The Alleged "Crisis” in Perspective, 1976 Ins LJ 90; Charbouneau, Medical Malpractice Crisis: Fact or Fiction?, 3 Orange County BJ 139).
Indeed, the factors alluded to by the comments I find objectionable are probably more suitable for exploration and consideration in a legislative rather than a judicial forum (see, for example, US Department of Health, Education and Welfare, Report of the Secretary’s Commission on Medical Malpractice, No. [OS] 73-88 [1973]; see, also, Elliot L. Sagall, M.D., Medical Malpractice: Are the Doctors Right?, Trial, Vol» 10, No. 4, p 59; Miller, Malpractice and You, 1975 Ins LJ 722).
In that context, the passage of the single bill to which the majority refers (L 1975, ch 109) hardly supports the so-called legislative (p 453) "general policy direction” on which it rationalizes the restrictive nature of its writing. In 1976, the year after that bill was enacted, after extensive hearings the officially designated "McGill Commission”, on which the medical profession was prominently represented, reported to the Legislature (and the Governor) that, because "any further reductions of the statute of limitations in medical malpractice actions would restrict patients’ rights without any correlative improvement in premium rates and insurance availability, the Panel makes no formal recommendations for changes in the statute of limitations” (Report of the Special Advisory Panel on Medical Malpractice of the State of New York, p 37 [1976]). Thereafter efforts at constriction have consistently failed to win legislative favor (see, e.g., Sen Intro No. S-9, Assem Intro No. A-3290 [1977 Session]; Sen Intro No. S-3672, Assem Intro No. A-5127 [1977 Session]; Sen Intro No. S-7858 [1976 Session]; Sen Intro No. S-4786-A [1976 Session]; Sen Intro No. S-8700 [1976 Session]; Sen Intro No. S-8751 [1976 Session]; Sen Intro No. S-8752 [1976 Session]; Sen Intro No. S-8753 [1976 Session]; Sen Intro No. S-8754 [1976 Session]; Sen Intro No. S-8755 [1976 Session]; Sen Intro No. S-8756 [1976 Session]; Assem Intro No. A-8779 [1976 Session]; Assem Intro No. A-11344 [1976 Session]).
When thus rejected, such efforts — whether fueled by legislative lobbying, or entrancing editorializing, or just plain propagandizing — form no foundation for public policy. Moreover, as to the overemphasis on "spectres of assertedly prohibitive cost”, fanciful or real, we ought here to apply our own recently stated injunction that, while "[a] court cannot responsibly be wholly indifferent to the economic impact likely to *457 attend its decisions * * *, neither can the prospect of financial impact dictate the judicial outcome” (Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84, 90). A fortiori, in this case, where essentially we focus on a liability, not a damage, question, the quantum of the latter in any event would be subject, as in all cases, to judicial safeguards against excessiveness — or inadequacy (CPLR 5522; see O’Connor v Papertsian, 309 NY 465; 7 Weinstein-Korn-Miller, NY Civ Prac, pars 5522.03, 5522.04).
Accordingly, I merely join in the result.
Chief Judge Breitel and Judges Jasen, Gabrielli, and Wachtler concur with Judge Jones; Judge Cooke concurs in a separate memorandum; Judge Fuchsberg concurs in result in a separate opinion.
Order reversed, etc.